# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| BlueLinx Corporation, | Civil No. 18-2322 (DWF/KMM) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| The Construction, Building Material, Ice & Coal Helpers & Inside Employees Union Local Number 120, | |
| Defendant. | |

Brett Alexander Janich, Esq., Justin Keith, Esq., Todd David Wozniak, Esq., Greenberg Traurig LLP; and Sarah A. Horstmann, Esq., Maslon LLP; counsel for Plaintiff.

Katrina E. Joseph, Esq., Teamsters Local No. 120, counsel for Defendant.

## INTRODUCTION

This matter is before the Court on cross motions for summary judgment brought by Plaintiff BlueLinx Corporation ("BlueLinx") (Doc. No. 22) and Defendant The Construction, Building Material, Ice & Coal Helpers & Inside Employees Union Local Number 120 (the "Local 120") (Doc. No. 26). For the reasons set forth below, the Court grants BlueLinx's motion and denies Local 120's motion.

## BACKGROUND

The following facts are not in dispute. Plaintiff BlueLinx is a building products distributor headquartered in Atlanta, Georgia, with distribution centers located

throughout the United States. (Doc. No. 1 ("Compl.") ¶ 1.) Since 1974, BlueLinx has operated a distribution center located in Maple Grove, Minnesota, referred to within the company as the "Minneapolis FMDC facility."[1] (*Id.*) The hourly material handlers and truck drivers employed by BlueLinx at the Minneapolis FMDC facility are represented by Local 120. (*Id.*)

Defendant Local 120 is a labor organization affiliated with the International Brotherhood of Teamsters headquartered in Blaine, Minnesota. (Compl. ¶ 2.) Local 120 represents employees in the warehousing, trucking, supply, and related industries in the District of Minnesota, and has been the duly recognized collective bargaining representative for bargaining units of the production and maintenance employees at the BlueLinx facility in Maple Grove for the entirety of the period in question. (Doc. No. 13 ("Counterclaim") ¶ 9.)

The parties entered a collective bargaining agreement (the "CBA") effective from July 15, 2014 to July 14, 2020, to renew automatically year to year thereafter unless either party gives written notice of termination 60 days prior to the annual date of expiration. (Compl. ¶ 5, Ex. 1 (the "CBA") at 23.) The title page of the CBA specifies that it is an agreement between "BlueLinx Corporation Minneapolis Minnesota FMDC and International Brotherhood of Teamsters Local 120." (CBA.) The Minneapolis facility is referenced in the singular throughout the document, and no street address for

---

[1] The city of Maple Grove is a suburb of Minneapolis, as is the neighboring city of Brooklyn Park. Both suburbs, as well as the city of Minneapolis, are located in Hennepin County, Minnesota.

the facility is specified. (*See Id.*, generally.) Article I of the CBA, Recognition, recognizes the Local 120 as:

> the sole bargaining agent for all Production and Maintenance employees including Material Handlers and Truck Drivers employed by [BlueLinx] at its Minneapolis, Minnesota FMDC facility . . . for the purpose of collective bargaining in respect to rates of pay, wages, hours of work and other conditions of employment.

CBA, Art. 1 Sec. 1.

The scope of the CBA is not clearly defined. Article 4, Management Rights, states that:

> . . . except as specifically limited or otherwise provided in this Agreement, the management of the [Minneapolis facility], it's [sic] operation, and the direction of it's [sic] working force is vested exclusively in [BlueLinx], including but not limited to, deciding the number and location of warehouses . . . . The exercise of such right and functions rests solely within the discretion of [BlueLinx].

CBA Art. 4, Sec. 1. Clauses within the CBA specify limitations but these are not exhaustive. The section immediately following the above section states that complaints by employees regarding discipline or discharge "may be taken up with the grievance procedure" (CBA Art. 4, Sec. 2), while another states that probationary employees have no recourse for discharge through the grievance or arbitration procedures (CBA Art. 7, Sec. 1). Article 12, entitled "Grievance & Arbitration," broadly states that "[s]hould grievance or dispute arise between [BlueLinx] and [Local 120] it shall be settled in the following manner," and outlines two steps for aggrieved employees to follow. (CBA Art. 12, Sec. 1.) If the initial steps fail to result in a satisfactory settlement, "the parties shall attempt to select and impartial arbitrator." (CBA Art. 12, Sec. 2.) The CBA does not

contain any articles or sections which specifically outline its scope of arbitrability or which expressly state whether the issue of arbitrability is itself subject to arbitration. The CBA also is silent with respect to any agreement on awarding attorney fees or litigation costs and does not address awards for legal expenses except for one reference in Article 12, in which the parties agree to pay their own costs incurred in connection with arbitration. (CBA Art. 12, Sec. 2(C).)

In March of 2018, BlueLinx announced plans to acquire a competitor, Cedar Creek Holdings, and completed the acquisition in April 2018. (Compl. ¶¶ 10-11.) Through this deal, BlueLinx acquired Cedar Creek Holdings' distribution facility, located in Brooklyn Park, Minnesota. (Compl. ¶ 12.) BlueLinx decided that it did not need to maintain a newly obtained Brooklyn Park facility in addition to its existing facility in Maple Grove and, on June 26, 2018, BlueLinx advised the Local 120 of its determination "that it makes sense to close one of the facilities." (Doc. No. 29, Ex. 2.) BlueLinx went on to state that because it was considering closing "the BlueLinx facility," it may "have an obligation to engage in decisional bargaining with the union representing its employees at the Minneapolis facility." (*Id.*) In an e-mail dated July 5, 2018, BlueLinx notified Local 120 that it decided that the Maple Grove facility would be the one to close, and that BlueLinx would engage in bargaining over the effects of the closure. (Doc. No. 29, Ex. 4.)

While the parties do not agree in their perception of some of the communications and bargaining that followed, they do agree that Local 120 filed a grievance based upon its assertion that BlueLinx wrongly refused to recognize Local 120 as the proper

bargaining agent for the employees at the Brooklyn Park facility acquired from Cedar Creek. (Doc. Nos. 24 at 3; 28 at 4.) Specifically, the grievance states that BlueLinx violated the CBA by notifying Local 120 "that it will no longer recognize [Local 120] as the sole bargaining agent for the Production and Maintenance employees including Material Handlers and Truck Drivers currently performing the work in its Bluelinx [sic] Minneapolis facility once the work is moved to a facility located across the street." (Doc. No. 29 ("Joseph Aff.") ¶ 8, Ex. 7.)

Prior to BlueLinx's acquisition of Cedar Creek, the Brooklyn Park employees were not represented by the Local 120. (Doc. No. 24 ("BlueLinx Memo") at 2.) There is nothing in the record to indicate that the employees at the former Cedar Creek facility have expressed any interest in being represented by any union. (*See generally* Doc. Nos. 22 and 26.) There also is no indication in the record that any BlueLinx employees from the Maple Grove facility have transferred to the Cedar Creek facility. (*Id.*)

The procedural history in this case is somewhat complicated by the preemptive nature of the initial action. BlueLinx filed suit first, seeking a declaratory judgment that the CBA does not apply to the employees at the former Cedar Creek facility and that the question of whether the CBA applies is not appropriate for arbitration. (Doc. No. 1.) Local 120 filed its answer and a counterclaim seeking an order to compel arbitration of Local 120's grievance under the provisions of the CBA. (Doc. No. 13.)

BlueLinx later moved for summary judgment, seeking a declaratory judgment that the parties' dispute over whether the CBA applies to the Cedar Creek facility employees working at the newly-acquired Brooklyn Park facility does not fall within the scope of the

5

CBA's arbitration provision. (Doc. No. 22.) BlueLinx further requests an injunction precluding Local 120 from prosecuting its arbitration demand, an award of its costs and attorney fees, and "such further relief as is just and equitable." (*Id.* at 2.) BlueLinx argues that the CBA's arbitration provision (CBA Art. 12) does not apply to the substance of Local 120's grievance because the CBA explicitly excepts management rights from arbitration, and that even if issues concerning the facility location are arbitrable, Local 120 is not the proper representative or bargaining unit for the former Cedar Creek employees working at the Brooklyn Park facility (BlueLinx Memo at 5, 7). BlueLinx requests declaratory judgment and injunctive relief to avoid effects of "the harmful uncertainty" introduced by the dispute. (BlueLinx Memo at 3.)

Local 120 likewise moved for summary judgment, requesting that this Court deny BlueLinx's motion and compel arbitration of the underlying grievance pursuant to Section 301 of the Labor Management Relations Act of 1974 ("LMRA"), 29 U.S.C. § 185. (Doc. No. 28 ("Local 120 Memo") at 11.) Local 120 contends that there is a vast body of caselaw which supports a strong presumption of arbitrability and that its grievance raises a dispute over the correct interpretation of Article 1 of the CBA which squarely falls within the scope of the CBA. (Local 120 Memo at 6, 10.)

The parties conferred pursuant to Fed. R. Civ. P. 26(f) and agreed that no discovery would be required to decide the issues in dispute, which are "purely legal in

6

nature." (Doc. No. 18, Report of Rule 26(f) Planning Meeting at 4.) The parties further agreed that there is no need for a trial. (Doc. No. 21, Scheduling Order at 3.)

## DISCUSSION

### I. Legal Standards

#### A. Summary Judgment

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B. Declaratory Judgment

The Declaratory Judgment Act states that in a case "of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). A court has jurisdiction if there is an "actual case or controversy." *Marine Equip. Mgmt. Co. v. United States*, 4 F.3d 643, 646 (8th Cir. 1993). To determine if such a controversy exists, the proper test is whether the facts alleged show that "under all the circumstances . . . there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation and quotation omitted). Declaratory judgment is not appropriate if it will not completely resolve the controversy. *Calderon v. Ashmus*, 523 U.S. 740, 749 (1998); *see also MedImmune*, 549 U.S. at 127 n.7.

## II. Arbitrability of the Dispute

The parties agree that this case turns on the question of whether their dispute is arbitrable under the CBA.

Although the parties focus on Section 301, this case implicates other sections of the LMRA (29 U.S.C. § 141, *et. seq.*) and an extensive body of caselaw applying the Act. Section 301 provides that lawsuits "for a violation of contracts between an employer and a labor organization . . . may be brought in any district court of the United States . . ." 29 U.S.C. § 185(a). The LMRA also states that employees "shall have the right to

self-organization" and "to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157. If an employer refuses to bargain collectively with the representatives of its employees pursuant to the provisions of the LMRA, that is an unfair labor practice. 29 U.S.C. § 158(a)(5). It also is an unfair labor practice for an employer to recognize a union as the exclusive bargaining representative of a group of employees if that union lacks majority support, even if the employer acted upon good-faith belief. *Int'l Ladies' Garment Workers' Union, AFL-CIO v. N. L. R. B.*, 366 U.S. 731, 738–39 (1961).

As the parties agree that the material facts in this case are undisputed, the Court's analysis is focused on the legal question of whether their dispute is subject to arbitration. In determining whether to compel arbitration, the Court usually must determine: (1) whether a valid agreement to arbitrate exists between the parties; and (2) whether the specific dispute is within the scope of that agreement. *Pro Tech Indus., Inc. v. URS Corp.*, 377 F.3d 868, 871 (8th Cir. 2004). Whether an enforceable arbitration agreement exists between litigants is a matter governed by state contract law. *Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 873 (8th Cir. 2018). If such an agreement exists, federal substantive law of arbitrability governs whether a dispute falls within its scope. *Id.*

Arbitration is "simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). Consequently, principles of contract law apply to arbitration agreements. *See Lucas v. American Family Mut. Ins. Co.¸* 403 N.W.2d 646, 648 (Minn. 1987). The construction and effect of a contract is a question of law unless the contract is ambiguous. *See Turner*

*v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn. 1979). Contract language is unambiguous if it is not reasonably susceptible of more than one meaning (*Swift & Co. v. Elias Farms, Inc.*, 539 F.3d 849, 851 (8th Cir. 2008)), and unambiguous contract language must be given its plain and ordinary meaning (*See Current Tech. Concepts, Inc. v. Irie Enters., Inc.*, 530 N.W.2d 539, 543 (Minn. 1995)). Any interpretation of a contract that would render a provision meaningless should be avoided. *See Indep. Sch. Dist. No. 877 v. Loberg Plumbing & Heating, Co.*, 123 N.W.2d 793, 799-800 (Minn. 1963).

The Supreme Court of the United States consistently supports a presumption of arbitrability. Elaborating upon the principles set forth in the series of 1960 cases known as the *Steelworkers Trilogy* (*Steelworkers v. American Mfg. Co.*, 363 U.S. 564; *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574; and *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593), the Supreme Court has instructed that an order to arbitrate a particular grievance should not be denied "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," with any doubts resolved in favor of coverage. *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (internal citations omitted).

Conversely, there is a presumption against arbitration of arbitrability itself. Courts should not assume that the parties agreed that arbitrators should decide arbitrability "unless there is clear and unmistakable evidence that they did so." *First Options of Chicago*, 514 U.S. at 944 (internal quotations and citations omitted).

"When the parties have agreed on an arbitration clause that appears to cover their dispute, it should be upheld." *3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1199 (8th Cir.

2008.) A valid arbitration agreement must be liberally construed, and if the clause is broad, a claim is arbitrable "as long as the underlying factual allegations simply touch matters covered by the arbitration provision." *Parm*, 898 F.3d at 874 (internal quotation marks and citations omitted). Courts must look past the labels offered by the parties to the underlying factual allegations. *Id.* at 875. Examples of broad arbitration clauses include language requiring arbitration of "all claims and disputes of any kind" (*Cargill, Inc. v. Nat'l Labor Relations Bd.*, 851 F.3d 841, 849 (8th Cir. 2017)), and "any controversy or claim arising out of or relating to [the agreement]" (*United Steelworkers of Am., AFL-CIO-CLC v. Duluth Clinic, Ltd.*, 413 F.3d 786, 789 (8th Cir. 2005). Parties may even agree to submit issues concerning the scope of their agreement by including specific language to that effect in the arbitration clause, such as "any disputes regarding the scope of the arbitration" (*Cargill, Inc.*, 851 F.3d at 849 (*quoting Andersen v. Equity Tr. Co.*, No. CV 18-471, 2018 WL 4623071, at *4 (D. Minn. Sept. 26, 2018)) or "any disputes or questions arising hereunder, including the construction or application" of the agreement (*DataStrait Networks, Inc. v. S2 Sec. Corp.*, No. CV 17-1355, 2017 WL 2729078, at *1 (D. Minn. June 23, 2017)).

Other plaintiffs have resisted arbitration with hypotheticals like those offered by BlueLinx, arguing that overly broad construction of an arbitration clause could lead to absurd results. For example, a catalog seller argued that liberal construction of such a clause would require arbitration of disputes concerning "a car accident between a consumer and her neighbor or the third-party courier who delivers the packages." *Parm*, 898 F.3d at 878. The Eighth Circuit rejected this reasoning because it "flip[s] the

11

inquiry" by asking whether a claim could be interpreted as falling outside the scope of an agreement when the presumption is that a claim is arbitrable unless it is "not susceptible of an interpretation that covers the asserted dispute." *Id.* (internal citations omitted).

Here, the CBA contains no article or section specifically addressing the scope of arbitrability or whether threshold disputes about arbitrability should be submitted to an arbitrator as outlined in the grievance procedure. As evidenced by their litigation, the parties disagree about the correct interpretation of the pertinent sections. BlueLinx contends that the "Minneapolis, Minnesota FMDC facility" referenced in Article 1 of the CBA means only the facility owned at the time the parties entered the agreement, and further, that the decision to close the Maple Grove facility and use the Brooklyn Park facility as its sole distribution center for the Twin Cities area falls squarely within the management rights excluded from arbitrability by Article 4. Local 120 argues that whether its precise location is in Maple Grove or in Brooklyn Park, BlueLinx has only one "Minneapolis" facility, and under the terms of the CBA, Local 120 represents the employees working there. By their reasoning, it follows that under the expansive wording of Article 12, their dispute with BlueLinx should be settled through the grievance and arbitration process.

This Court cannot conclude with certainty that the arbitration clause of the CBA is not broad enough to encompass the parties' dispute. Both parties' proffered constructions are reasonable, which, in keeping with the presumption of arbitrability, would ordinarily end the analysis and lead to the conclusion that this matter should be submitted for arbitration.

## III. Appropriate Bargaining Representative

This Court's analysis cannot be completed by examining the CBA alone. As explained above, there must first be a finding that the agreement is valid. The Local 120 argues that it is the appropriate employee representative for bargaining pursuant to the agreement, including in the arbitration of disputes related to the employment of the Cedar Creek facility workers. Fatal to this argument is the "first principle" of the *Steelworkers Trilogy*: "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs.*, 475 U.S. at 649.

The Fourth Circuit has examined the relevant issues drawing from caselaw across circuits. New employees acquired by an employer through the acquisition of an entire facility are presumptively treated as a separate bargaining unit and are not compelled to be included in a pre-existing bargaining unit without first being given the opportunity to express their preference through a secret election. *Sara Lee Bakery Grp., Inc. v. N.L.R.B.*, 296 F.3d 292, 297-98 (4th Cir. 2002). To avoid thwarting their rights of self-determination, new employees will not be accreted into an existing bargaining unit without a vote unless the group in question "have an insufficient group identity to function as a separate unit" and "have interests that are so closely aligned with those of the preexisting bargaining unit" that it can be safely assumed they would opt into the unit given the chance. *Id.* at 297 (internal quotation marks and punctuation omitted). Factors used to determine this alignment of interests include similarity in the scale and manner of determining earnings and employment benefits and the kind of work performed,

geographic proximity, continuity or integration of production processes, history of collective bargaining, and the desires of the affected employees. *Id.* at 298. Accretion of employees to a bargaining unit is only appropriate in "extraordinary cases" where in light of these factors, no election is required because the accreted employees "share such similar interests with employees in the bargaining unit that they would choose it." *Baltimore Sun Co. v. N.L.R.B.*, 257 F.3d 419, 428 (4th Cir. 2001). Misuse of accretion threatens the self-determination rights of employees guaranteed by the LMRA, and courts vigilantly protect these rights by upholding labor policy that requires an election to resolve "substantial doubt." *Id.* at 429 (discussing application of 29 U.S.C. § 157).

The Eighth Circuit has recognized that it is a "well-established precept of labor law that for the life of a collective-bargaining agreement the status of the union as exclusive bargaining representative may not ordinarily be questioned," and that a workplace relocation is not considered the type of extraordinary circumstance that would prevent application of this rule. *King Soopers, Inc. v. N.L.R.B.*, 254 F.3d 738, 742 (8th Cir. 2001) (internal quotation marks and citations omitted). However, the situation presented in this case can be distinguished from the "workplace relocation" in *King Soopers*, where union-represented employees from one store were moved to a new store located a quarter-mile away, under "nonunion terms." *Id.* at 741. The Eighth Circuit weighed the following factors in determining whether there was sufficient continuity in conditions to maintain the existing representation: (1) continuity of operational methods, managerial hierarchy, customer, and services or products; (2) distance between the old and new plants; and (3) *changes in either the size, makeup, or the identity of the employee*

*complement*. *Id.* at 743. In that case, nearly all the employees from the original store transferred to the new location, and they worked under "the exact same supervision and management" performing "the exact same job." *Id.*

Here, there is no information in the record regarding the working conditions of the Cedar Creek employees such as the terms of their compensation or benefits that would enable this Court to make the comparisons required under the Fourth Circuit's framework, which it finds persuasive. Nor is there any information to indicate that the employees at the Cedar Creek facility wish to be represented by Local 120, or any union for that matter. To the contrary, these employees have never been represented by a union. Critically, they have not voted in an election. Without any indication from the affected employees at the Cedar Creek facility that it is their desire to be represented by Local 120, this Court has no way of knowing if their historical lack of representation is the result of apathy, a lack of perceived benefit, or a philosophical opposition to the notion. Significantly, no employees from the Maple Grove facility have transferred to the new one in Brooklyn Park, never mind a number significant enough to change or subsume the character of the employees as a body.[2] The fundamental policy of the LMRA is self-determination. *Metromedia, Inc. KMBC TV v. N.L.R.B.*, 586 F.2d 1182, 1191 (8th Cir. 1978). As noted above, the "first principle" from the *Steelworkers Trilogy*

---

[2] Counsel for the parties acknowledged the fact that no employees have transferred from the older facility during oral arguments during the Motion Hearing held on March 22, 2019. (Doc. No. 37.) According to BlueLinx's briefing on the issue, "closure of the BlueLinx Minneapolis FMDC facility will not involve a transfer of a significant number of bargaining unit employees" from the Maple Grove facility to the Brooklyn Park facility. (BlueLinx Memo at 8.)

15

is that a party cannot be required to submit a dispute to arbitration without agreeing to do so. *AT & T Techs.*, 475 U.S. 648.  The employees at Cedar Creek never selected the Local 120 as their bargaining unit, and this Court will not impose such representation upon them.  Declaratory judgment is appropriate because the sole issue before the Court can be resolved; the Local 120 cannot properly represent the Cedar Creek facility employees pursuant to the arbitration procedure described in the CBA.

BlueLinx offered no legal authority or facts to justify its request for an award of its litigation costs and attorney fees in its memorandum of law.  Without any such support, this Court will not award BlueLinx legal expenses.

# ORDER

Based upon the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff BlueLinx's Motion for Summary Judgment (Doc. No. [22]) is **GRANTED** and the Court hereby declares that the arbitration provision of the parties' CBA does not encompass their dispute over whether Local 120 should be recognized as the bargaining agent for the Cedar Creek facility employees and further orders that Local 120 is precluded from continuing to pursue its arbitration demand under the CBA.

2. Defendant Local 120's Motion for Summary Judgment (Doc. No. [26]) is **DENIED**.

3. No award of costs or fees is granted to either party.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: April 30, 2019                    s/Donovan W. Frank
                                         DONOVAN W. FRANK
                                         United States District Judge